UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANIEL ANTHONY MCDADE,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 17-cv-00763-JCS

**ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 15, 22

## I.    INTRODUCTION

Plaintiff Daniel McDade brings this action appealing the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (the "Commissioner") denying McDade's application for disability benefits.  The parties have filed cross motions for summary judgement pursuant to Civil Local Rule 16-5.  For the reasons discussed below, McDade's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED to the Commissioner for an award of benefits.[1]

## II.    BACKGROUND

Because McDade's motion and the Court's decision turn primarily on McDade's anxiety disorder, the summary of the record and arguments below focuses on that issue, as addressed by the parties and the ALJ, and is not intended as a comprehensive description of the administrative record, the ALJ's decision, or McDade's medical history.

### A.    McDade's Medical Records

On June 11, 2013, McDade sought treatment for dizziness, diarrhea and heartburn which occurred when he was at work.  Administrative Record ("AR," dkt. 9) at 436.  He reported feeling

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

like blacking out, along with dizziness that lasted for an hour and was more prominent when seated. *Id.* McDade reported that the abdominal pain and diarrhea had occurred for eleven years intermittently and had worsened in the five months prior to his visit. *Id.* at 437. McDade was referred to a gastroenterologist, who diagnosed gastroesophageal reflux disease ("GERD") and prescribed Pantoprazole on June 20, 2013. *Id.* at 437, 440.

On June 27, 2013, McDade sought treatment in the emergency room for GERD, at which time he was prescribed Ativan for anxiety. *Id.* at 444. Two days later, on June 29, 2013, McDade reported increased anxiety and that the Ativan was not working. *Id.* The physician increased McDade's Ativan dose to twice daily. *Id.* On July 1, 2013, McDade again reported increased anxiety, another visit to the emergency room for shortness of breath and wheezing, and increased GERD symptoms. *Id.* at 446. On July 10, 2013, McDade sought treatment for anxiety and inability to sleep. *Id.* at 453. He reported having gone to the emergency room again for dizziness the week prior. *Id.* The medical record notes that a colonoscopy and Holter monitoring to rule out inflammatory bowel disease and heart arrhythmias respectively were both normal. *Id.* at 454. McDade reported stress regarding an upcoming family road trip, as well as familial stress regarding his health. *Id.* McDade reported experiencing tunnel vision, shortness of breath, palpitations and stomach aches. *Id.* The record notes that Ativan helped. *Id.* The doctor documented a primary encounter diagnosis of anxiety, referred McDade to the psychiatric department and prescribed Celexa for anxiety. *Id.* at 455.

On July 11, 2013, McDade saw Natalie Todd, Psy.D., to complete an Adult Therapist Intake Evaluation. *Id.* at 562. McDade reported his panic attacks started five weeks prior, and that he had experienced six panic attacks since onset. *Id.* His first panic attack occurred at work when he felt overwhelmed by his workload. *Id.* At the time of his evaluation, McDade was unable to identify a trigger for his subsequent panic attacks. *Id.* His fear of panic attacks had prevented him from working the four weeks prior to the visit. *Id.* He also feared having a panic attack while driving, though he did not avoid driving due to this fear. *Id.* McDade explained that he experienced embarrassment regarding his dyslexia at his job and nervousness when speaking to his boss. *Id.* When completing a mental status examination, Dr. Todd noted that McDade

appeared well-groomed and was pleasant, cooperative, and fidgety. *Id.* at 564. His speech, thought content, attention, concentration and fund of knowledge were all normal. *Id.* His mood was euthymic, he demonstrated appropriate and a full range of affect, and his thought process was logical. *Id.* Additionally, McDade was fully oriented; his recent and remote memories were intact; and his impulse control, insight and judgement were all good. *Id.* Dr. Todd noted that McDade did not meet the criteria for Generalized Anxiety Disorder at the time. *Id.* at 562. Dr. Todd diagnosed panic disorder and a Global Assessment of Functioning ("GAF") score of 51 to 60, indicating moderate symptoms. *Id.* at 564.

On July 16, 2013, McDade reported difficulty sleeping at night partly due to anxiety, for which a provider recommended McDade take melatonin nightly. *Id.* at 459–60. McDade attended an "Immediate Treatment of Anxiety Group" therapy session on the same day, during which he shared he that he was experiencing work stress and believed this to be a primary trigger for him as his panic attacks most often occurred at work. *Id.* at 554. On the Immediate Treatment of Anxiety Group Checklist, McDade indicated having panic and anxiety attacks, which he feared having again, and that this fear interfered with his life. *Id.* at 558. He indicated that the attacks had begun a month prior. *Id.* He also indicated social symptoms of anxiety; the presence of trauma, including repeated unwanted thought patterns; and excessive worrying. *Id.* at 560. The group leader, Jessica Lande, Psy.D., diagnosed panic disorder. *Id.* at 554.

On July 17, 2013, McDade saw Naureen Khan, M.D., to whom he reported that his symptoms had worsened. *Id.* at 545. McDade reported his anxiety had lasted for many years, with "[s]ymptoms includ[ing] insomnia, agitation, decreased concentration, excessive worry, restlessness, muscle tension, hypervigilance, somatic complaints, shortness of breath, fear of dying and fear of losing control/going crazy." *Id.* He completed a mental health survey in which he indicated than on most days he had little energy, felt bad about himself and unproductive, and had trouble focusing. *Id.* at 552. He also reported he felt nervous, anxious, or on edge, and was unable to stop or control worrying nearly every day. *Id.* McDade's panic attacks included "fear of dying, fear of losing control/going crazy, palpitations, lightheadedness, chest pain and sweating." *Id.* at 545. McDade reported he first experienced such symptoms for one hour in 1995 when his

father passed away. *Id.* He again experienced symptoms in 2011 when two of his wife's family members passed away within a short period of time. *Id.* He did not seek help at the time as he was able to control symptoms. *Id.* McDade reported that he began experiencing panic attacks on a daily basis three weeks prior to his visit with Dr. Khan. *Id.* He reported feeling stressed at work, and that the demands of his job made him anxious. *Id.* He additionally stated his sleep had been disturbed, that he was easily irritated, and that he would snap at his family. *Id.* He denied feeling sad or depressed, though his wife reported believing he was depressed. *Id.* When taking melatonin, McDade reported he would sleep for six to seven hours a night. *Id.* He reported frequent ER visits. *Id.* Dr. Khan diagnosed panic disorder, with problems related to McDade's social environment and occupational problems. *Id.* at 548. Dr. Khan prescribed Celexa, and planned to taper McDade's Ativan prescription due to its addictive nature. *Id.* McDade's mental status examination was normal other than his mood being anxious and his affect being appropriate to his anxious mood. *Id.* at 547.

On July 25, 2013, McDade called his doctor to report many of the side effects of Celexa were intolerable. *Id.* at 543. He had been taking Celexa for two weeks during which time the side effects did not ameliorate. *Id.* He reported feeling like a "zombie," depressed, jittery, nauseated and unable to get out of bed. *Id.* The doctor changed McDade's prescription from Celexa to Prozac. *Id.*

McDade again saw Dr. Todd on July 30, 2013, at which time he reported he had no panic attacks since his last session. *Id.* at 534. McDade stated that group therapy was helpful, as were increased exercise and yoga. *Id.* He reported taking Prozac daily and that he felt he was managing his anxiety well. *Id.* McDade reported returning to work, speaking with his boss about his stress, lowering his workload, changing his office location to sit closer to others, and eating his lunch outside to relax. *Id.* He stated that he was looking forward to family vacation, and spending more time with his family and wife. *Id.* He agreed to keep a daily mood log to track his anxiety and panic attacks. *Id.* Upon mental status examination, McDade was appropriately dressed, his mood was euthymic, and he demonstrated full, appropriate affect. *Id.* at 535. Dr. Todd assessed a GAF score of 51 to 60, indicating moderate symptoms. *Id.*

4

After moving from California to Florida, *see id.* at 506, McDade sought medical treatment at Amana Medical Center on August 20, 2013 to discuss lowering his dosage of Ativan, and to get refills of his prescriptions. *Id.* at 495. He reported his anxiety attacks had worsened in the past two months, with fluctuating frequency. *Id.* The doctor diagnosed generalized anxiety disorder, and changed McDade's medication from Prozac to Buspirone and Omeprazole. *Id.* McDade was advised to increase his dietary and exercise efforts. *Id.*

McDade again saw a doctor at Amana Medical Center on August 26, 2013. *Id.* at 494. He reported Ativan addiction, and experiencing withdrawal symptoms when weaning off the medication, including shaking, shortness of breath, sleeplessness, inability to focus, and tearfulness. *Id.* McDade reported he had not begun to take Buspirone because he feared addiction. *Id.* Although McDade did not express any suicidal ideation, he repeatedly stated, "there is no light at the end of the tunnel," and the treating physician reported he appeared hopeless and depressed. *Id.* The physician referred McDade to Lakeside Behavioral Clinic for evaluation and treatment of depression. *Id.*

McDade completed an intake screening at Lakeside Behavioral Clinic on August 27, 2013. *Id.* at 506. He reported a decrease in daily activity, low energy, racing thoughts, panic attacks, confusion, forgetfulness, and problems sleeping. *Id.* McDade continued to take Ativan, though he was slowly trying to stop taking it due to its addictive properties. *Id.* He attributed his symptoms to the side effects of stopping Ativan. *Id.* On his mental status examination, Tamra Brown, a master's level provider, noted McDade was alert and oriented to person, place, time, and situation. *Id.* at 507. McDade demonstrated poor concentration, normal speech, poor insight, broad affect, and anxious mood. *Id.* Brown diagnosed anxiety disorder not otherwise specified, indicated McDade had risk factors of severe panic/anxiety and anhedonia, and assessed a GAF score of 51. *Id.* at 506, 509.

On August 30, 2013, McDade spoke with Dr. Khan via telephone from Florida, noting that he was returning to California "in a few days." *Id.* at 529. McDade reported that stopping Ativan was "miserable" with increased anxiety, agitation, insomnia and restlessness. *Id.* Upon restarting taking Ativan, he began feeling better. *Id.* He reported he had been sleeping six to seven hours a

night. *Id.* McDade stated that he was not having increased anxiety or panicky feelings. *Id.* He stopped taking Prozac because it made him feel jittery and had gastrointestinal side effects. *Id.* He began taking 5mg of Buspar daily but had not noticed an improvement. *Id.* He reported he was having fun vacationing in Florida with his family, describing the weather as being nice with some heavy rains. *Id.* He stated he was fearful that his flight would get delayed. *Id.* He denied having depressive symptoms. *Id.* Dr. Khan recommended McDade increase his dose of Buspar to 5mg twice daily, and continue with 1mg of Ativan daily. *Id.*

On September 17, 2013, McDade was seen at Lakeside Behavioral Adult Outpatient Medical Clinic. *Id.* at 503. He sought continued treatment for his anxiety, and also reported that he might have underlying depression. *Id.* McDade reported experiencing low appetite, sleep disturbance, dizziness, headaches, dry mouth, muscle tension, and GERD. *Id.* at 513. The provider noted on a mental status examination that McDade was cooperative and that he spoke at a normal rate and with a normal rhythm. *Id.* at 504. He was oriented to person, place, time, and situation. *Id.* His mood was depressed and anxious, and his affect was blunted. *Id.* His thought processes were coherent, logical, and organized. *Id.* He denied suicidal ideation, suicidal attempts, homicidal ideation, auditory hallucinations, visual hallucinations, paranoia, and grandiosity. *Id.* His memory was intact, as measured by recall of three objects at time intervals. *Id.* He had difficulty with concentration and attention, and his insight and judgement impulse controls were fair. *Id.* The provider increased Buspar from 15mg to 15mg twice daily to decrease anxiety, prescribed Trazadone to help with insomnia, and prescribed Lexapro to decrease anxiety and depression. *Id.* at 505. McDade was referred to group therapy, and to the Center for Drug Free Living for detox from Ativan. *Id.*

On November 18, 2013, McDade reported that Buspar was making him lethargic and sleepy all day long. *Id.* at 516. According to McDade's wife, this was not normal for him. *Id.* McDade also reported that he stopped taking Ativan and that his anxiety was getting better. *Id.* His wife reported that his attention was poor at times and that he was very moody. *Id.* On mental status examination, McDade's speech was normal, his concentration was difficult at times, his mood was depressed and anxious, he appeared to be adequately groomed, his thought content and

6

process were congruent, and his recent and remote memory, insight and judgment were fair. *Id.* The provider assessed a GAF score of 50, and recommended lowering his Buspar dose. *Id.* at 517.

On December 3, 2013, McDade reported experiencing dizziness, headache, and blurry vision. *Id.* at 492. He attributed these symptoms to the Buspar, which he reported was not working. *Id.* The provider diagnosed generalized anxiety disorder, insomnia, post-traumatic stress disorder, dizziness and giddiness, and headache. *Id.* McDade was advised to stop taking Buspar, increase dietary efforts and exercise, start Celexa again, and continue Trazadone. *Id.*

On February 10, 2014, McDade reported only being able to sleep four hours a night. *Id.* at 520. He also reported that he was easily agitated, and although his appetite was fair, he would not eat some days. *Id.* He reported Buspar made him lightheaded, with decreased memory. *Id.* He reported having panic attacks twice a day. *Id.* Upon mental status examination, McDade's speech was normal; his remote and recent memory, concentration, insight and judgement were fair; he appeared adequately groomed; and his mood/affect and thought content/process were congruent. *Id.* His GAF was assessed to be 50. *Id.* at 521. The provider advised him to discontinue Buspar, increase Lexapro, add Atarax, and continue Trazadone. *Id.*

McDade saw Juana Gonzalez Aguirre, M.D., at John Muir Health in Concord, California on December 19, 2014. *Id.* at 588. Dr. Aguirre diagnosed insomnia and an anxiety disorder. *Id.* at 590. On January 19, 2015, McDade reported that his anxiety was stable, but not completely resolved. *Id.* at 573. He also reported continued insomnia, only sleeping two to three hours a night, and up to six hours on a good night. *Id.* Dr. Aguirre again diagnosed an anxiety disorder. *Id.* at 576.

McDade began seeing Matthew Littlefield, M.D., on December 6, 2014. *Id.* at 596. McDade reported he continued to experience panic attacks lasting a few minutes characterized by sudden, intense feelings of anxiety, unprovoked difficult breathing, heart racing, and feeling out of control. *Id.* He reported that work and financial stress increased the severity of his panic attacks, and his relocation to Florida had worsened his panic attacks. *Id.* McDade stated that Lexapro had relieved the panic attacks to a small extent, but reported that the medication gave him headaches. *Id.* On mental status examination, McDade's speech was normal, his mood was anxious, his affect

7

1  was mildly anxious, and his thought process was linear. *Id.* His judgment and insight were good

2  to fair and his attention was good. *Id.* Dr. Littlefield diagnosed panic disorder and evaluated

3  McDade's GAF to be 60. *Id.* at 597. Dr. Littlefield recommended supportive therapy and

4  psychoeducation, changed McDade's Celexa and Vistaril doses, stopped Trazodone, and began

5  Ambien for insomnia. *Id.*

6        On January 8, 2015, McDade reported to Dr. Littlefield that he continued to experience

7  significant anxiety, which worsened when in public. *Id.* at 594. McDade reported that he "could

8  not go with [his] wife to the store," and experienced difficulties Christmas shopping in the mall.

9  *Id.* McDade stated that his medications had not changed his symptoms, and reported excess

10  sedation with the increased Vistaril dose. *Id.* Dr. Littlefield noted an improvement in mood/affect

11  but no improvement in his thought process and content. *Id.* Dr. Littlefield evaluated a GAF score

12  of 60. *Id.* Dr. Littlefield increased McDade's dose of Celexa, and reduced his Vistaril dosage. *Id.*

13        McDade saw Dr. Littlefield again on March 7, 2015, at which time McDade reported

14  having panic attacks when out of the house or in crowds, stating, "when I'm around crowds I'm

15  getting anxious, my body breaks out." *Id.* at 593. McDade also reported that when at his home he

16  experienced anxious feelings related to his daughters' stress. *Id.* His anxiety remained severe, and

17  he was unable to work. *Id.* McDade reported a decrease in symptoms with his medication, and

18  non-compliance with his medication regimen. *Id.* Dr. Littlefield assessed an improvement in

19  mood/affect, as well as thought process/content. *Id.* Dr. Littlefield again increased McDade's

20  Celexa dose as McDade had a limited response to that medication as well as several SSRIs. *Id.*

21        On July 22, 2015, McDade again saw Dr. Littlefield and reported an increase in symptoms

22  of Generalized Anxiety Disorder, including insomnia, excess worries, irritable mood, and

23  difficulty concentrating due to anxious thoughts and mood. *Id.* at 609. McDade experienced

24  difficulties with anhedonia, but was able to enjoy his children's sporting events. *Id.* McDade's

25  mood was more hopeful due to an upcoming move but also reported that he had "been really

26  anxious." *Id.* Although McDade reported that his symptoms had decreased due to medication, his

27  anxiety remained severe and escalated in the evenings. *Id.* Dr. Littlefield noted that McDade's

28  mood and affect had worsened, with his mood being "more anxious recently," and his affect

"restricted, tense at times." *Id.* McDade spoke at a normal, non-pressured rate; demonstrated linear thought process, good judgment and fair insight; and had fair recent and remote memory recall. *Id.* Dr. Littlefield rated McDade's GAF at 50, and modified his medication. *Id.* at 610.

Dr. Littlefield completed a Mental Health Treatment Questionnaire on August 10, 2015. *Id.* at 619. In this report, Dr. Littlefield diagnosed Generalized Anxiety Disorder and Panic Disorder. *Id.* He assessed a GAF score of 50, and reported that McDade's highest GAF score in the past year was 50 to 55. *Id.* He described McDade as experiencing motor tension, apprehensive expectation, autonomic hyperactivity, vigilance and scanning as part of his generalized persistent anxiety. *Id.* Dr. Littlefield also noted that McDade experienced persistent irrational fears and recurrent severe panic attacks, which were less severe with treatment. *Id.* Dr. Littlefield reported McDade experienced sleep disturbance, mood disturbance, social withdrawal or isolation, generalized persistent anxiety, feelings of guilt and worthlessness, and difficulty thinking or concentrating. *Id.* at 620. Dr. Littlefield found McDade's functional limitations as a result of his mental impairments to be marked in activities of daily living and maintaining social functioning, in particular in public and family settings. *Id.* at 621. Dr. Littlefield stated McDade had frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. *Id.* Dr. Littlefield also reported that McDade has had repeated (three or more) episodes of deterioration or decompensation in work or work-like settings. *Id.* Dr. Littlefield opined that McDade was unable to function independently outside the area of his home and required family assistance. *Id.* Additionally, according to Dr. Littlefield's assessment, McDade's anxiety would cause him to be absent from work more than three times a month, and he would have difficulty working a regular job on a sustained basis. *Id.* at 622. Dr. Littlefield also noted that McDade's anxiety had caused a substantial loss of ability to understand, remember, and carry out simple tasks; respond appropriately to supervision, co-workers, and unusual work situations; and deal with changes in a routine work setting. *Id.* Dr. Littlefield indicated that McDade's condition had lasted and was expected to last at least twelve months and expressed a "guarded/limited" prognosis. *Id.* at 620, 622.

McDade began seeing predoctoral intern Yurio Miyazawa, Ed.M., M.A., on May 13, 2015.

*Id.* at 606.  Miyazawa's treating notes document McDade as having an ongoing anxious mood and affect, with treatment often focused on his current functioning, anxiety in social situations, and familial relationships.  *Id.* at 599–600, 602, 604–06.  Miyazawa noted that McDade experienced extreme difficulty discussing his anxiety disorder and dyslexia.  *Id.* at 600.  Miyazawa observed that during their first meeting McDade's speech was pressured and his legs were jittery.  *Id.* at 606.  Miyazawa completed an Assessment and Diagnosis on June 10, 2015, noting that McDade:

> presents with various symptoms of generalized anxiety, including restlessness, being easily fatigued, difficulty concentrating, muscle tension, and severe sleep disturbance which leaves him sleep-deprived for a few days at times. He also suffers from panic attacks with such symptoms as pounding heart, sweating, abdominal distress, feeling dizzy, and fear of losing control. These symptoms cause clinically significant distress in occupational and social functioning, which kept him unemployed for the last few years. Although he made tremendous effort to remain composed, his intense anxiety was readily apparent to the clinician in the initial meeting.

*Id.* at 601.  Miyazawa further reported that McDade appeared mildly unhealthy, was severely restless and fidgety, had mild rapid speech, moderate depression and sadness, mild attention span difficulties and severe anxiety.  *Id.* at 602.  Miyazawa diagnosed Generalized Anxiety Disorder.  *Id.* at 603.

On June 25, 2015, after meeting with McDade at least five times, Miyazawa completed a Treating Therapist Report.  *Id.* at 607, 612.  In the report, Miyazawa opined that McDade was unable to meet competitive standards regarding his ability to "maintain attention for two hour segment," and "maintain regular attendance and be punctual within customary, usually strict tolerances."  *Id.* at 612.  Miyazawa also evaluated McDade as having no useful ability to "[w]ork in coordination with or proximity to others without being unduly distracted," "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms," "[p]erform at a consistent pace without an unreasonable number and length of rest periods," and "[d]eal with normal work stress."  *Id.*

**B.    Consulting Medical Opinions and Administrative Applications**

In reports prepared for McDade's initial disability application, state agency consulting psychologists determined that he had the following severe impairments: (1) asthma, (2) anxiety

10

disorders; and (3) affective disorders. *Id.* at 94.

On January 9, 2014, David Clay, PhD, assessed McDade as having mild restrictions in activities of daily living ("ADL"); mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. *Id.* Dr. Clay wrote that McDade's "limitations in completing personal care tasks, cooking, cleaning, shopping, traveling in public, paying bills, maintaining a residence, getting along with others, initiating social interactions, actively participating in group activities, interacting with the public, responding appropriately to authority figures, and working cooperatively with coworkers are considered mild in nature." *Id.* Considering that McDade's "capacity for concentration, persistence, and pace appear[ed] to be moderately impaired by the presence of the aforementioned mental impairments," Dr. Clay opined that McDade "may experience difficulty attending to work related responsibilities and [he] may have more than typical difficulty with task completion due to difficulties with concentration and pace." *Id.* Dr. Clay concluded that McDade was "capable of independent, appropriate and effective ADL and social functioning on a sustained basis." *Id.*

Dr. Clay found that McDade was not significantly limited in his ability to: (1) carry out very short and simple instructions; (2) carry out detailed instructions; (3) perform activities within a schedule; (4) maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or in proximity to others without being distracted by them; and (7) make simple work-related decisions. *Id.* at 97. Dr. Clay concluded McDade was moderately limited in his ability to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.*

Dr. Clay considered McDade "to be partially credible as there are clinical indicators that appear to be consistent" with the medical record, and answered positively to the question, "[a]re the individual's statements about the intensity, persistence, and functionally limiting effects of the symptoms substantiated by the objective medical evidence alone?" *Id.* at 94–95.

On January 9, 2014, Maureen Muir, SDM, assessed some environmental limitations and

determined that McDade needed to "avoid concentrated exposure" to "[f]umes, odors, dusts, gases, poor ventilation, etc." due to his asthma. *Id.* at 96. On his initial application, McDade was found not disabled and capable of performing "whatever job he is able to find in the national economy" with a note that, "[w]hile he does have asthma it does not appear to hinder him from working." *Id.* at 99.

In response to McDade's request for reconsideration, in a report dated March 18, 2014 consulting psychologist Mercedes DeCubas, PhD, reached substantially the same conclusions as Dr. Clay, repeating word for word Dr. Clay's explanation. *Id.* at 106–07. On March 31, 2014, Dr. R. James Mabry, MD, reached the same conclusion as Muir that McDade needed to "avoid concentrated exposure" to "[f]umes, odors, dusts, gases, poor ventilation, etc." *Id.* at 109–10. In the second report, McDade was once again found to be capable of "whatever job he is able to find" and not disabled. *Id.* at 113.

### C. Administrative Hearing

Administrative Law Judge Mary Parnow (the "ALJ") held a hearing on August 3, 2015. *See* AR at 56. After clarifying that McDade's attorney at the time, Rosemary Dady, had submitted her brief to the record, the ALJ permitted Dady to give a short opening statement summarizing the arguments in her brief. *Id.* at 60; *see also id.* at 613–17 (Dady's pre-hearing brief). Dady argued McDade satisfied Listing 12.06 governing anxiety disorders, as he has a "medically documented anxiety disorder accommodate [sic] by frequent panic attacks, recurrent severe panic attacks manifested by sudden unpredictable onset by intense apprehension, fear, terror, and since [sic] of impending doom . . . occurring at least once a week." *Id.* at 60.

In response to Dady's questions, McDade testified that during his last employment he experienced difficulties due to "a lot of diarrhea and stomach pains." *Id.* at 64. He subsequently experienced a panic attack during which he "felt like blacking out," and his "heart was pounding." *Id.* at 65. His boss had to send him to a room, and then called for a taxi to drive him home. *Id.* Looking back, McDade believes he first had a panic attack in 1995, the year his father passed away, though the attacks did not impact his functioning until 2013. *Id.* at 67–68.

McDade testified that he experienced around three panic attacks a week, with each attack

lasting about five minutes. *Id.* at 63–64. McDade connected his physical symptoms, including

GERD, asthma and frequent headaches, with his anxiety. *Id.* at 64. McDade indicated his panic

attacks do not always have a specific trigger, though he noted stress, including familial stress,

contributed to the attacks. *Id.* McDade described his panic attacks as "extremely horrible," as he

experiences "heart pounding, dizziness . . . [and] really feel[s] like throwing up." *Id.* at 63. Due to

his panic attacks, McDade is unable to concentrate and focus on tasks. *Id.* at 65. For example, he

struggles when cooking, has a hard time calming himself down and is forgetful. *Id.*

McDade testified that he is no longer as social as he once was, and he doesn't attend family

functions or other similar gatherings with large numbers of people. *Id.* He no longer attends

church because, during the baptism of his sister's child, he experienced a panic attack and had to

leave because he "couldn't breathe, almost like fainting." *Id.* at 67. McDade testified that he

sometimes leaves the house with his daughter or his wife. *Id.* at 66. He additionally goes to the

gym two to three times a week, though he is can only tolerate going during off-peak times and if

he feels any anxiety, he leaves. *Id.* at 68. While at the gym, he tries to use the Jacuzzi as it helps

relax him and calms his nerves. *Id.*

McDade stated that speaking with his therapist was "[a] little bit helpful." *Id.* at 67. He

testified that his medications cause him to experience dry mouth, sometimes stomach pains, and a

little bit of dizziness. *Id.* at 68.

After Dady completed her questioning of Mr. McDade, Dady questioned Jennifer McDade,

Mr. McDade's wife. *Id.* at 69. Ms. McDade stated that she first met Mr. McDade in October

2002 when they began dating. *Id.* Ms. McDade testified that Mr. McDade began to become ill at

work in June 2013. *Id.* at 70. After a series of tests, Mr. McDade was diagnosed with generalized

anxiety and panic attacks. *Id.* at 71. Ms. McDade stated that Mr. McDade appears to be

depressed, has a lower libido, and cries more often than previously. *Id.* at 75–76. Ms. McDade

described Mr. McDade as drowsy and lacking emotional affect due to his medication. *Id.* at 74–

75.

Ms. McDade stated that prior to his increase in anxiety and panic attacks, Mr. McDade was

able to do everything, from taking care of their daughter to working a highly skilled job. *Id.* at 70.

13

Mr. McDade previously engaged in sports with friends, but now when visiting friends, Ms. McDade has to ascertain how many people will be there as Mr. McDade cannot be around large groups. *Id.* at 72. Mr. McDade still attends his daughter's sporting events, as he can retreat to a grassy area or the car to lay down if he feels anxious. *Id.* Ms. McDade stated that Mr. McDade will go to the store with their daughter, who was eleven years old at the time and helped Mr. McDade remember to take basic things like his phone and wallet with him. *Id.* at 73. Ms. McDade cannot give Mr. McDade too much money because he will lose it. *Id.*

Ms. McDade cannot ask Mr. McDade to complete too many tasks around the house, as he will become frustrated and forget, so she has to write things down on a list for him. *Id.* For example, Mr. McDade will start doing laundry but not complete it. *Id.* Ms. McDade stated that Mr. McDade can only make things like sandwiches but is unable to cook because he is forgetful and may burn food. *Id.* at 75. Ms. McDade testified that Mr. McDade cannot drive when there is a lot of traffic and can only drive close to home, though even in familiar areas, Mr. McDade will miss his stops. *Id.* at 74. Ms. McDade opined that Mr. McDade's stomach problems, difficulty concentrating and inability to take on more than one task would make it difficult for him to hold down a job. *Id.* at 76.

The ALJ subsequently questioned Mr. McDade about his previous work positions as a records clerk, records coordinator, and office clerk. *Id.* at 77–79. The ALJ then questioned vocational expert Robert Cottle (the "VE"). *Id.* at 79–83. The ALJ first presented the hypothetical scenario of someone with McDade's age, education, and work experience, who must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, is "able to understand, retain, and remember simple instructions, and [can] only occasional[ly have] contact with the general public." *Id.* at 81–82. The VE testified that such a person would not be able to work in the previous positions held by McDade. *Id.* at 82. The VE stated that such a person could work in a number of jobs that are relatively common in both California and the United States as a whole. *Id.* The ALJ's second hypothetical described an individual with the same limitations as the first hypothetical but who can only accept instructions at the beginning of a shift and cannot work as part of a team or one-on-one with supervisors. *Id.* at 82–83. The VE testified that there

14

would be no jobs available for such a person.  *Id.* at 83.

Dady asked the VE whether someone with the limitations reported by therapist Miyazawa[2] could find work if they were unable to maintain attention for two hour segments, and the VE testified that such a person would be precluded from all work.  *Id.*  The VE also stated a person having the same limitations who was also unable to maintain regular attendance or be punctual within customary, usually strict, tolerances, would be precluded from all work.  *Id.*  Dady also asked if there would be jobs available for someone who was unable to perform at a consistent pace without more than the allowed number of rest breaks, and the VE testified that if the person were precluded from 20 percent of the work tasks, there would be no jobs available.  *Id.* at 87.

### D.    Regulatory Framework for Determining Disability

#### 1.    Five-Step Evaluation Process

The Commissioner uses a "five-step sequential evaluation process" to determine if a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  At step one, the ALJ must determine if the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  If so, the ALJ determines that the claimant is not disabled and the evaluation process stops.  If the claimant is not engaged in substantial gainful activity, then the ALJ proceeds to step two.

At step two, the ALJ must determine if the claimant has a "severe" medically determinable impairment.  An impairment is "severe" when it "significantly limits [a person's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a "severe" impairment, then the ALJ will find that the claimant is not disabled.  If the claimant has a severe impairment, the ALJ proceeds to step three.

At step three, the ALJ compares the claimant's impairment with a listing of severe impairments (the "Listing").  *See* 20 C.F.R. § 404, subpt. P, app. 1.  If the claimant's impairment

---

[2] Miyazawa assessed McDade as unable to meet competitive standards regarding his ability to "maintain attention for two hour segment" and "maintain regular attendance and be punctual within customary, usually strict tolerances."  AR at 612.  Miyazawa also evaluated McDade to have no useful ability to "[w]ork in coordination with or proximity to others without being unduly distracted," "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms," "[p]erform at a consistent pace without an unreasonable number and length of rest periods," and "[d]eal with normal work stress."  *Id.*

is included in the Listing, then the claimant is disabled. The ALJ will also find a claimant disabled if the claimant's impairment or combination of impairments equals the severity of a listed impairment. If a claimant's impairment does not equal a listed impairment, then the ALJ proceeds to step four.

At step four, the ALJ must assess the claimant's residual function capacity ("RFC"). An RFC is "the most [a person] can still do despite [that person's] limitations" caused by that person's impairments and related symptoms. 20 C.F.R. § 404.1545(a)(1). The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is "work that [a person] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the person] to learn how to do it." 20 C.F.R. § 404.11560(b)(1). If the claimant is able to perform past relevant work, then the ALJ finds that the claimant is not disabled. If the claimant is unable to perform past relevant work, then the ALJ proceeds to step five.

Normally, at step five, the burden shifts from the claimant to the Commissioner. *Johnson v. Chater*, 101 F.3d 178, 180 (9th Cir. 1997). The Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite her identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999). If the Commissioner is able to identify such work, then the claimant is not disabled. If the Commissioner is unable to do so, then the claimant is disabled. 20 C.F.R. § 404.1520(g)(1).

## 2. Supplemental Rules for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process. *See generally* 20 C.F.R. § 404.1520a;[3] *see also Clayton v.*

---

[3] The parties' briefs do not address amendments to the regulations and listings pertaining to mental impairments that became effective after the ALJ's decision but before McDade filed the present action. With no party arguing that the new versions of those regulations and listings should apply here, the Court assumes for the purpose of this order that the versions of the mental impairment regulations and listings in effect at the time of the ALJ's decision continue to apply. Citations to all such regulations and listings therefore refer to those versions. McDade separately argues that the Court should apply newer regulations related to sources other than excepted medical sources (here, Miyazawa), *see, e.g.*, Reply at 7, but the Court does not reach that issue because the ALJ's

*Astrue*, No. CIV 09-2282-EFB, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011) (citing *Maier v. Comm'r of Soc. Sec. Admin.*, 154 F.3d 913 (9th Cir. 1998)). First, the Commissioner must determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(b)(2), (c). Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1. 20 C.F.R. § 404.1520a(d). If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the evaluation proceeds to step four of the general disability inquiry. *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria). *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00. Therefore, any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the general Paragraph B criteria, which require that the claimant suffers at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *See id.* A "marked" limitation is one that is "more than moderate but less than extreme" and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of

---

failure to credit Dr. Littlefield's opinions is reason enough to reverse, and neither party argues that the applicable standard for evaluating the opinion of a treating physician has meaningfully changed as a result of any amendments.

limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* at 12.00C.

### E. The ALJ's Decision

At step one of the five-step disability determination, the ALJ concluded that McDade had not engaged in substantial gainful activity since the alleged onset of his disability on July 5, 2013. AR at 25. At step two, the ALJ concluded that McDade had established that his anxiety disorder, panic disorder and asthma were all severe impairments because each significantly limits McDade's ability to perform basic work activities. *Id.* The ALJ concluded that McDade's depression was non-severe because the records indicate that anxiety and panic attacks are his primary mental diagnoses. *Id.*

At step three, the ALJ concluded that McDade's impairments did not meet or equal any listing in the Adult Listing of Impairments, specifically rejecting listings 12.04 and 12.06. *Id.* at 26. The ALJ noted "Paragraph B" is satisfied by a showing of mental impairment in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. *Id.* The ALJ found that McDade's medical records indicated no restrictions in activities of daily living and in concentration, persistence or pace, moderate difficulties in social functioning, and no episodes of decompensation of extended duration. *Id.* The ALJ also considered and rejected finding a disability under "Paragraph C" criteria for 12.04, which require repeated episodes of decompensation, a residual disease process that has resulted in such marginal adjustment that a minimal increase in mental demands or environment would be predicted to cause decompensation, or an inability to function outside a highly supportive living arrangement. *Id.* The ALJ also found McDade's medical records did not indicate that he is completely unable to function independently outside the area of his home due to his anxiety, thus he did not meet the "Paragraph C" requirements for listing 12.06. *Id.*

At step four, the ALJ concluded that McDade had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional

limitations: McDade is "capable of performing simple, repetitive tasks, can occasionally work with the general public, and must avoid concentrated exposure to pulmonary irritants." *Id.* at 27.

In determining McDade's residual functional capacity, the ALJ followed a two-step procedure. *Id.* First, the ALJ determined McDade had medically determinable impairments that could reasonably be expected to produce his symptoms. *Id.* Second, the ALJ evaluated the intensity, persistence, and limiting effects of McDade's symptoms to determine the extent to which the symptoms limit McDade's functioning. *Id.* The ALJ noted that, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [she] must make a finding on the credibility of the statements based on a consideration of the entire case record." *Id.* The ALJ determined that although McDade's medically determinable impairments could reasonably be expected to cause his symptoms, his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.* at 28. According to the ALJ, "[t]he medical evidence of record does not provide strong support for the claimant's allegations of disabling symptoms and limitations," and "the objective medical findings do not support the existence of limitations greater than those determined in the residual functional capacity." *Id.*

In making this determination, the ALJ summarized McDade's medical history, emphasizing the opinions of Dr. Littlefield, and pre-doctoral intern Miyazawa. *Id.* at 28–32. Because the ALJ's conclusions regarding the weight given to Dr. Littlefield's opinions are central to the outcome of this appeal, the ALJ's paragraph addressing Dr. Littlefield's opinion warrants reproduction in full:

> In assessing the residual functional capacity, I am according little weight to the August 10, 2015 medical source statement from Dr. Littlefield (Ex. 15F). Dr. Littlefield reported that the claimant's current GAF was 50 and that his highest GAF in the past year was 50 to 55 (Id. at 2). Dr. Littlefield opined that the claimant has marked restriction of activities of daily living, marked difficulties maintaining social functioning, frequent deficiencies of concentration, persistence or pace, and repeated (3 or more) episodes of deterioration or decompensation in work or work-like settings (Id. at 4). Dr. Littlefield further opined that the claimant would likely be absent from work more than 3 times a month and that his mental condition has caused a substantial loss of ability to understand, remember and carry out simple instructions, respond appropriately to supervision, coworkers

and usual work situations, and deal with changes in a routine work setting (Id. at 5). However, Dr. Littlefield's opinion is inconsistent with his underlying treatment records, which indicate that the claimant had decreased symptoms with use of his medications and that Dr. Littlefield rated the claimant's GAF score at 60 at most visits (Exhibit 10F/2, 3, 6). While Dr. Littlefield did rate the claimant's GAF at 50 on occasion (Exhibit 12F/3), this was during a visit when the claimant was experiencing an increase in his anxiety symptoms. The preponderance of the medical evidence indicates that the claimant has received GAF scores ranging from 51 to 60, indicating moderate symptoms (Exhibits 4F/2, 3, 6; 8F/8, 21, 37) [sic[4]].

Id. at 31–32 (citing AR at 618–622, 593–94, 597, 610, 504–05, 508, 535 548, 564).

The ALJ's conclusions regarding the weight given to Miyazawa's opinions are also central to the parties' arguments, although as discussed below the Court does not reach the question of whether the ALJ erred with respect to these opinions:

I am according also according [sic] little weight to the July 25, 2015 opinion of Yurio Miyazawa, Ed.M, a predoctoral intern therapist (Exhibit 13F/2). Ms. Miyazawa opined that the claimant is unable to meet competitive standards in the abilities to maintain attention for two-hour segment, maintain regular attendance and be punctual within customary, usually strict tolerances. Additionally, Ms. Miyazawa opined that the claimant has no useful ability to function in the abilities to work in coordination with or proximity to others without being unduly distracted, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to deal with normal work stress. However, Ms. Miyazawa's opinion is not supported by the underlying treatment records, which do not substantiate the foregoing level of limitations. In April 2015, Ms. Miyazawa reported that mental status examination revealed that the claimant was within normal limits in most categories (Exhibit 11F/5). Ms. Miyazawa reported that the claimant had mild impairments in terms of appearing healthy, rapid speech and attention span, had moderate impairment in terms of depression, sadness, and had severe impairment in terms of anxiety and being restless, fidgety (Id.). Additionally, I note that an intern therapist is not an acceptable medical source under the Regulations (20 CFR 404.1513(a) [sic].

Id. at 32 (citing AR at 612, 602).

The ALJ concluded McDade's subjective complaints as to the severity of his symptoms were not fully credible, and that the "record contains significant inconsistencies and does not

---

[4] The ALJ's citations to Exhibit 4F medical records indicating that the claimant received GAF scores ranging from 51 to 60 are incorrect. Exhibit 4F/2 (AR at 504) does not state a GAF score; Exhibit 4F/3 (AR at 505) documents a GAF score of 50; Exhibit 4F/6 (AR at 508) does not state GAF score, although 4F/7 (AR at 509) documents a score of 51.

support the level of restrictions alleged." *Id.* The ALJ noted that:

> while the claimant testified that he is not social and rarely goes out, he also testified that he goes to the gym 2 to 3 times a week, although during off hours, and uses the Jacuzzi. Additionally, the record indicates that the claimant is able to attend his children's sporting events and enjoys himself (Exhibit 12F/2). The claimant's wife, Jennifer McDade, testified that the claimant is able to walk to the store to buy milk and eggs and he can drive, although he misses exits. Additionally, I note that the claimant was able to take a one-month vacation to Florida and reported having fun (Exhibit 8F/2). All of the above activities seem to suggest that the claimant is able to leave his house quite a bit.

*Id.* at 32–33 (citing AR at 609, 529).

The ALJ accepted the VE's testimony that McDade was unable to perform past relevant work as a "Director, Records Management" and as an "Administrative Clerk." *Id.* at 33.

Finally at step five, the ALJ credited the VE's testimony that work would be available for someone with the RFC that she had assessed (which corresponded to the first hypothetical that she presented to the VE at the hearing). *Id.* at 34. The ALJ concluded that McDade was capable of working as Marker II, Plastics Inspector, and Table Worker, and thus McDade was not disabled within the meaning of Social Security regulations. *Id.*

## F.   The Parties' Argument

### 1.   McDade's Motion for Summary Judgement

McDade's motion was filed late, after the Court issued an order to show cause why the case should not be dismissed for failure to prosecute. The quality of the briefs from McDade's counsel Lawrence D. Rohlfing is unacceptable. Portions of the briefs are incoherent, and there are a number of indications that Rohlfing failed to read the record closely or proofread his own briefs before filing them. For example:

- "McDade files this brief on the grounds that there are no issues of triable fact and that M [sic] is entitled to judgment as a matter of law." Notice of Mot. (dkt. 15) at 1.

- "McCade [sic[5]] completed a mental health survey endorsing . . . not being able to

---

[5] Across more than two pages of his summary of the medical evidence, Rohlfing misspells his client's name, using "McCade" rather than "McDade." Pl.'s Mot. at 5–7. In one instance in the

use stopper control worrying nearly every day . . . ."  Pl.'s Mot. (dkt. 15) at 5.

- "Resuming medication allowed him to sleep better; had no increased anxiety or panicking feelings with BusPar; and was on vacation."  *Id.*

- "Jessica land [sic], PsyD, diagnosed date [sic] as having a panic disorder."  *Id.*

- "On mental status examination, Dr. Littlefield noted and [sic] anxious mood; and affect with mild anxiety; good to fair judgment and insight.  *Id.*  rule [sic] out generalized anxiety disorder with a  global assessment of functioning of 60.  Dr. Littlefield change [sic] the prescription . . . ."  *Id.* at 7.

- "The period from July 2013 through August 2015 remained a temporal span during which McDade wasn't [sic, possibly intended as 'was in'] self-imposed isolation."  *Id.* at 12.

- "Assuming McDade did not meet listing 12.06, he would lack the ability to engage in substantial gainful activity is absenteeism would preclude substantial gainful activity."  *Id.* at 13.

- "Her Littlefield made similar findings."  *Id.*

- "The Commissioner draws attention to GAF scores of 60 or is Dr. Littlefield identified GAF scores in his medical source statement between 50-55."  Reply (dkt. 25) at 5.

- "Miyzazwa [sic[6]] may be express [sic] an opinion that McDade lack [sic] the ability to engage in the competitive standards for maintaining attention . . . ."  *Id.* at 6.

The Court expects submissions from licensed attorneys to adhere to at least minimal standards of grammar and comprehensibility.  Counsel is admonished that any future filing from the Law Office of Lawrence D. Rohlfing, in this or any other case, that fails to meet those standards may be stricken sua sponte, and that extreme deficiencies may result in referral to the Court's Standing Committee on Professional Conduct.

---

reply brief, Rohlfing refers to his client as "McBain."  Reply at 6.
[6] Rohlfing repeatedly misspells the name of one of the two medical professionals primarily at issue, Yurio Miyazawa, as "Miyzazwa."  *E.g.*, Mot. at 9; Reply at 6–8.

1    McDade argues that the ALJ erred in: (1) failing to properly weigh and credit Dr.

2    Littlefield opinion regarding the severity of his anxiety and panic disorders, Pl.'s Mot. at 10; (2)

3    failing to properly weigh and credit pre-doctoral intern Miyazawa's opinions regarding the

4    severity of his anxiety and panic disorders, *id.*; and (3) finding that McDade's impairments did not

5    meet a listing, *id.* at 12–13.

6         McDade contends that the ALJ failed to meet the standard necessary to reject a treating

7    physician's opinion. *Id.* at 11. According to McDade, the ALJ must articulate clear and

8    convincing reasons for rejecting Dr. Littlefield's opinion if uncontradicted by substantial evidence

9    in the record, or specific and legitimate reasons if contradicted by substantial evidence in the

10   record. *Id.* (citing *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995)). McDade contends that

11   the ALJ's stated reasons for giving limited weight to Dr. Littlefield's opinions—that the

12   deterioration noted in Dr. Littlefield's August 2015 assessment of McDade's "represented a

13   singular event and that McDade had generally experienced a global assessment of functioning in

14   the moderate range, between 51 and 60"—are illegitimate. *Id.* at 11–12. In making this argument,

15   McDade cites the Commissioner's response to comments on the 2000 revision of mental

16   impairment evaluation criteria, which requested that the Social Security Administration apply

17   GAF scores to the disability adjudication process. *Id.* at 12 (quoting 65 Fed. Reg. 50746, 50765

18   (August 21, 2000)). The Commissioner stated:

19              We did not adopt the comment. We did not mention the GAF scale to
              endorse its use in the Social Security and SSI disability programs, but
20            to indicate why the third sentence of the second paragraph of the
              proposed 12.00D stated that an individual's medical source "normally
21            can provide valuable additional functional information." To assess
              current treatment needs and provide a diagnosis, medical sources
22            routinely observe and make judgements about an individual's
              functional abilities and limitations. The GAF scale, which is
23            described in the DSM–III–R (and the DSM–IV), is the scale used in
              the multiaxial evaluation system endorsed by the American
24            Psychiatric Association. It does not have a direct correlation to the
              severity requirements in our mental disorders listings.
25

26   65 Fed. Reg. 50746, 50764–50765 (Aug. 21, 2000). According to McDade, the listings described

27   by the Commissioner in the foregoing quote remained in effect through January 16, 2017. *Id.* at

28   12 (citing POMS DI 34232.011). McDade states that the current listings did not adopt the GAF

score as correlative or informative to disability. *Id.* (citing 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00 and 12.06). Thus, McDade argues the "ALJ articulated an illegitimate reason for rejecting the opinions of Dr. Littlefield." *Id.*

McDade next argues that the ALJ failed to credit the opinions of pre-doctoral psychological intern Miyazawa and "must explain the weight given to the pre-doctorate psychological intern with two master's degrees." *Id.* at 13–14 (citing AR at 32; 20 C.F.R § 404.1527(f)(2) (2017)). Although Miyazawa is not an "acceptable medical source," McDade argues that "[t]he Commissioner anticipates that opinions from sources other than acceptable medical sources may provide better and more detailed information than is available from or even contradicting treating sources." *Id.* at 13 (citing 20 C.F.R. § 404.1527(f)(1) (2017)).

According to McDade, the ALJ's determination that Miyazawa's opinion "lacked the support of underlying treatment records" is incorrect. *Id.* McDade notes that "Miyazawa described McDade as severely restless and fidgety with severe anxiety," and argues that Dr. Littlefield made similar findings. *Id.* (citing AR at 602, 609). To demonstrate "[t]he longitudinal record supports the findings of Miyazawa," McDade cites Dr. Littlefield's inability to find the correct medication combination for McDade, as well as McDade's "appetite disturbance, sleep disturbance, physical manifestations, palpitations, cognitive dysfunction, muscle tension and gastrointestinal distress." *Id.* (citing AR at 505, 520, 513, 576, 594, 593, 597, 609, 610).

McDade also argues that he meets "Paragraph C" criteria for listing 12.06 according to Dr. Littlefield's opinion in which he found "McDade had marked impairments in activities of daily living; social functioning; frequent deficiencies of concentration, persistence, or pace; and repeated episodes of deterioration or decompensation." *Id.* at 12–13 (citing AR at 621). According to McDade, he "cannot function outside of the home without assistance," and has been in self-imposed isolation from July 2013 to August 2015, experiencing "severe anxiety" and having "stopped working, a primary trigger for his anxiety and fear." *Id.* at 12–13. McDade argues that he "cannot engage in gainful activity because he meets the listing." *Id.* at 13.

If the Court were to find that McDade does not meet listing 12.06, McDade contends that he lacks "the ability to engage in substantial gainful activity is [sic] absenteeism would preclude

substantial gainful activity." *Id.* According to McDade, "substantial gainful activity implies and requires a sustained capacity to engage in work activity." *Id.* at 14 (citing Social Security Ruling 96-8p). He argues that "a sporadic capacity of months here and there does not establish the ability to engage in substantial gainful activity." *Id.* (citing *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692–93 (9th Cir. 1999)).

McDade asks the Court to credit the opinions of Dr. Littlefield and Miyazawa as true. *Id.* (citing *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014)). According to McDade, the record is complete, the ALJ failed to provide legally sufficient reasons for rejecting Dr. Littlefield and Miyazawa's opinions, which require a finding of disability, and thus the Court should reverse and order the payment of benefits. *Id.* (citing *Trevizo v. Berryhill*, 871 F.3d 664 (9th Cir. 2017)).

### 2. The Commissioner's Cross-Motion for Summary Judgement

The Commissioner argues that the ALJ properly rejected the opinions of Dr. Littlefield and predoctoral therapist intern Miyazawa, while giving greater weight to the state agency psychological consultants. Comm'r's Mot. (dkt. 22) at 1–2.

The Commissioner argues that the ALJ "may disregard the treating physician's opinion whether or not that opinion is contradicted." *Id.* at 2. According to the Commissioner, substantial evidence supports the ALJ's conclusion that Dr. Littlefield's August 2015 report was inconsistent with his treatment notes. *Id.* at 3. The ALJ first rejected Dr. Littlefield's opinion because the underlying treatment records "indicate[d] that the claimant had decreased symptoms with use of his medications." *Id.* (citing AR at 32). The Commissioner points out two examples in Dr. Littlefield's records in which McDade's symptoms decreased as a result of his medications. *Id.* (citing AR at 31, 593, 609). The Commissioner also cites the treatment notes of Naureen Khan, M.D., from August 2013 in which McDade reported "having fun with his family while vacationing in Florida, and that he was not having depressive symptoms after he resumed Ativan for anxiety." *Id.* (citing AR at 30, 529).

Second, according to the Commissioner, the ALJ properly rejected Dr. Littlefield's opinion due to the inconsistency between his August 2015 report, which stated McDade's highest GAF score in the year prior was 50 to 55, and his treating notes, which documented GAF scores of 60.

*Id.* (citing AR at 32, 619). The Commissioner argues that this "difference is significant because a GAF score of 50 indicates serious symptoms or impairment while a score of 51-60 reflects moderate symptoms or impairment." *Id.* (citing Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n 1994)).

In arguing that substantial evidence in the record supports "the ALJ's recognition of the inconsistent GAF scores," the Commissioner cites multiple medical reports which assess McDade's GAF to be 51 to 60. *Id.* (citing AR at 564, 535, 548, 565). The Commissioner states that the two instances of lower scores—scores of 51 and 50 in August 2013 and September 2013 respectively—occurred "when Plaintiff increased symptoms after trying to wean himself off Ativan for anxiety." *Id.* (citing AR at 30, 509, 505). The Commissioner also cites Dr. Littlefield's GAF assessments of 60 from December 2014, January 2015, and March 2015. *Id.* at 3–4 (citing AR at 31, 593–94, 597, 619).

Further, the Commissioner argues that McDade misstates the Commissioner's position regarding the use of GAF scores in determining a disability claim. *Id.* at 4 (citing Pl.'s Mot. at 12). Although "[t]he Commissioner does not consider single GAF scores to correlate to work-related functional limitations in Social Security disability claims, nor are they determinative of disability," according to the Commissioner, the ALJ rejected Dr. Littlefield's opinion because of the *inconsistency* in Dr. Littlefield's GAF scores, not the GAF scores themselves. *Id.* The Commissioner argues this "discrepancy was a valid reason to reject the questionnaire because Dr. Littlefield appeared to exaggerate Plaintiff's condition." *Id.* (citing 20 C.F.R. § 404.1527(c)(3)–(4)). The Commissioner contends that "the GAF scores in the record generally indicated only a moderate level of impairment while the questionnaire indicated much more extreme limitations." *Id.*

The Commissioner additionally argues that the ALJ reasonably rejected the July 2015 report from pre-doctoral intern Miyazawa. *Id.* at 5. According to the Commissioner, the ALJ was only required to give germane reasons for discrediting Miyazawa's report because Miyazawa is not an acceptable medical source. *Id.* (citing 20 C.F.R. § 404.1513(a), (d); *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)). The Commissioner argues that the ALJ's finding that

Miyazawa's report conflicted with Miyazawa's treatment records is a germane reason for rejecting lay witness testimony. *Id.* (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2011)). The Commissioner states that "[t]he Court must affirm [the ALJ's interpretation] even where there are two possible interpretations to draw from a record, and the ALJ's interpretation is reasonable." *Id.* (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)). According to the Commissioner, the ALJ's rejection of Miyazawa's opinion was based on "a reasonable interpretation of the record for which there is supporting substantial evidence." *Id.* at 6. The Commissioner cites Miyazawa's notes from April 2015 in which Miyazawa reported that McDade's mental status examination was within normal limits in most categories. *Id.* at 5 (citing AR at 32, 602). The Commissioner argues that Miyazawa's determination of McDade's impairments, and that he "'responded well to intervention'" in therapy, further supports the ALJ's interpretation. *Id.* (citing AR at 32, 600, 602–06).

The Commissioner finally argues that if the Court should find reversible error, it should remand the case for further administrative proceedings. *Id.* at 6. The Commissioner contends that the credit-as-true rule—Ninth Circuit case law that in some circumstances allows a court to credit evidence and award benefits based on that evidence if it finds that the agency did not properly evaluate that evidence in the first instance—is invalid; and even if valid, the Commissioner argues it does not apply here. *Id.* According to the Commissioner, the credit-as-true rule requires courts to assess "whether further administrative proceedings would be useful and whether there are outstanding issues that must be resolved before a finding of disability may ensue." *Id.* (citing *Treichler v. Comm'r*, 775 F.3d 1090, 1101, 1105 (9th Cir. 2014)). The Commissioner argues that the Court cannot apply the credit-as-true rule here as "crediting the disputed medical opinion evidence would create a conflict with the other opinions of Drs. Clay and DeCubas upon which the ALJ relied." *Id.* at 7 (citing AR at 32; *Dominguez v. Colvin*, 808 F.3d 403, 409 (9th Cir. 2016)). The Commissioner argues that "the record contains serious doubt . . . that Plaintiff is actually disabled," particularly in light of McDade's failure to challenge the ALJ's assessment that McDade's own testimony was not credible due to the ALJ's finding of inconsistencies between McDade's testimony and the medical record. *Id.*

### 3. Reply

McDade's reply acknowledges that the ALJ is not bound by opinions of a treating physician; however, he argues that the ALJ must give such opinion more weight under 20 C.F.R. § 404.1527(c)(2)(2017).  Reply at 4.  McDade argues that the ALJ is required to give a statement of specific and legitimate reasons supported by substantial evidence when rejecting a treating physician's opinion.  *Id.* (citing *Lester*, 81 F.3d at 830–31).

According to McDade, the "presence of occasional GAF scores that imply a lack of an ability to sustain work activity [even in conjunction with] with frequent GAF scores that imply the presence of an ability to sustain work activity does not permit the ALJ to find that the claimant has the *sustained* capacity to engage in work activity."  *Id.* (citing Social Security Ruling 96-8p (statement of purpose ¶ 1)).  McDade defines "sustained capacity for work" as being able "to engage in work-related mental activities in a work setting . . . on a regular and continuing basis, eight hours a day, five days a week, or an equivalent work schedule."  *Id.* at 4–5 (citing Social Security Ruling 96-8p (statement of purpose ¶ 1)).

Addressing the inconsistency in Dr. Littlefield's GAF scores, McDade argues that "[w]hether the upper end of the score falls at 51 or 60, the distinction lacks a difference."  *Id.* at 5.  According to McDade, Dr. Littlefield's opinion about McDade's sustained capacity to work is not undermined by Dr. Littlefield's three GAF assessments of 60 and other providers' assessments of scores ranging from 51–60, "[t]hose 10 points fall within the range described by standard diagnostic methodology of moderate symptoms or difficulties in functioning."  *Id.*

McDade further argues that this inconsistency in Dr. Littlefield's record does not demonstrate that he exaggerated his symptoms.  *Id.*  McDade notes that the ALJ did not "cite any evidence of a medical practitioner expressing the opinion that McDade appeared to exaggerate his condition."  *Id.*

According to McDade, the ALJ's reliance on GAF scores in rejecting Dr. Littlefield's opinions violates agency policy.  *Id.* at 6.  McDade asks the court to credit the opinions of Dr. Littlefield as true and to find McDade disabled.  *Id.* at 6 (citing *Vasquez v. Astrue*, 572 F.3d 586, 594 (9th Cir. 2009); *Garrison*, 759 F.3d at 995).

McDade argues that the Commissioner applies the incorrect standard required to explain the rejection of Miyazawa's opinion. *Id.* at 6 (citing Comm'r Mot. at 5). According to McDade, the Commissioner relies on "the regulations and rulings in effect at the time of the ALJ decision"; however, the March 27, 2017 regulations "apply on their face to the review of all pending claims." *Id.* at 4 (citing Comm'r's Mot. at 2; 20 C.F.R. § 404.1527(2017)). McDade argues that courts should apply applicable amended regulations to pending cases. *Id.* at 7 (citing *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 647–49)). According to McDade, under the 2017 amended regulation, an ALJ must explain the weight given to non-acceptable medical source opinions in a sufficiently specific way to allow the "'reviewer to follow the adjudicator's reasoning.'" *Id.* at 6 (quoting 20 C.F.R. § 4040.1527(f)(2)).

Under this standard, McDade argues that the ALJ failed to explain why Miyazawa's finding that McDade was "severely restless and fidgety; having severe anxiety; and having moderate depression" on mental status examination was inconsistent with Miyazawa's finding that McDade lacked the ability to work in coordination with or proximity to others; to complete a normal workday or workweek without interruptions from his anxiety-based symptoms; to perform at a consistent pace; or to deal with work stress. *Id.* McDade argues that "[s]evere anxiety as the only symptom can be debilitating" and that "the presence of an otherwise normal mental status examination" does not negate Miyazawa's opinion. *Id.* at 6.

## III. ANALYSIS

### A. Legal Standard

#### 1. Judicial Review of Social Security Determinations

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1987) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

"Where evidence is susceptible to more than one rational interpretation," the ALJ's decision should be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks and citation omitted). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)).

Although the Court may "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [the ALJ] did not rely," *Garrison*, 759 F.3d at 1010, "harmless error analysis applies in the social security context." *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015). "But where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency can decide whether re-consideration is necessary. By contrast, where harmlessness is clear and not a borderline question, remand for reconsideration is not appropriate." *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (footnotes, citations, and internal quotation marks omitted).

If the Court identifies defects in the administration proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison*, 759 F.3d at 1019–21.

### 2. Evaluation of Treating Physician Medical Opinions

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

30

who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830. "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). "'The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician.'" *Id.* (quoting *Lester*, 81 F.3d at 831). The Ninth Circuit has emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).
>
> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

*Garrison*, 759 F.3d at 1012−13 (footnote omitted); *see, e.g.*, *Kinzer v. Colvin*, 567 F. App'x 529, 530 (9th Cir. 2014) (finding the ALJ's conclusion without any explanation that one treating physician's opinion was "'not well-supported by the . . . other objective findings in the case

record,' and that [another treating physician's] opinion 'contrast[ed] sharply with the other evidence of record,' were insufficient to dispose of the treating doctor's opinions").

Moreover, the ALJ should not give greater weight to the opinions of a non-treating physician over a treating physician "without explaining the § 404.1527(d)(2)–(6) factors[7] that render the treating physician's opinion not 'controlling.'" *Wilson v. Astrue*, 435 F. App'x 636, 640 (9th Cir. 2011).

## B. The ALJ Erred in Failing to Credit Dr. Littlefield's Opinion

Dr. Littlefield, as McDade's treating physician, brings a "unique perspective to the medical evidence." *See* 20 C.F.R. § 404.1527(c)(2). "The treating physician's continuing relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment." *Lester*, 81 F.3d at 833. Dr. Littlefield began treating McDade on December 6, 2014. AR at 596. Prior to the ALJ's decision, Dr. Littlefield had seen McDade at least four times, and completed a report on August 10, 2015, setting forth his opinions of McDade's relevant limitations. *Id.* at 593–96, 609–10, 619–22.

The ALJ rejected Dr. Littlefield's August 2015 opinion as she found it "inconsistent with his underlying treatment records" for two reasons: (1) Dr. Littlefield's treating notes reported McDade "had decreased symptoms with use of his medications"; and (2) Dr. Littlefield's report stated McDade's highest GAF in the past year was 50 to 55, while his treating notes documented GAF scores of 60. *Id.* at 31–32 (citing AR at, e.g., 593, 609).

The ALJ's first reason for rejecting Dr. Littlefield's report—that McDade's symptoms improved when medicated—does not constitute a "specific, legitimate reason" supported by substantial evidence contained in the record to justify discrediting Dr. Littlefield's opinion. *See*

---

[7] Because McDade filed his application before March 27, 2017, the rules stated in 20 C.F.R. § 404.1527 apply to this case. Amendments to that section after the date of the decision in *Wilson* renumbered the relevant factors from subpart (d) to subpart (c) of § 404.1527. More recent applications are governed by 20 C.F.R. § 404.1520c rather than § 404.1527, but that newer regulation is not applicable to McDade's pre-2017 application.

*Garrison*, 759 F.3d at 1012. Although Dr. Littlefield and other medical sources documented that medication ameliorated McDade's anxiety, "such observations must be 'read in context of the overall diagnostic picture' the provider draws." *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (quoting *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)); *see Lester*, 81 F.3d at 833 ("Occasional symptom-free periods . . . are not inconsistent with disability."). That a patient's anxiety improved on medication "does not mean that the person's impairment[] no longer seriously affect[s his] ability to function in a workplace." *Holohan*, 246 F.3d at 1205.

Dr. Littlefield's treatment notes consistently reflect that McDade continued to experience severe levels of anxiety, which required adjustment of his medications. AR at 593–97, 609–10, 619–22. As noted by McDade, "Dr. Littlefield could never quite get the medication combination to work properly for McDade." Pl.'s Mot. at 13 (citing AR at 593–94, 597, 609–10). Further, there is no evidence that any improvements McDade experienced over the course of his treatment would increase his functional capacity. *See Garrison*, 759 F.3d at 1017 ("Reports of 'improvement' in the context of mental health issues must be interpreted . . . with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in the workplace."). For example, on July 22, 2015, despite McDade reporting decreased symptoms due to his medication, Dr. Littlefield noted McDade's anxiety remained severe and escalated in the evenings, and adjusted his medication dosages. AR at 609–10. The Court therefore holds that McDade's relative improvements at some visits with Dr. Littlefield do not, in themselves, demonstrate that Dr. Littlefield's opinion is inconsistent with his treating notes such that the ALJ could set aside the opinion of McDade's treating physician.

The ALJ's second reason for rejecting Dr. Littlefield's opinion—that Dr. Littlefield's August report stated McDade's highest GAF in the past year to be 50 to 55, while his treating notes assessed scores of 60—also does not constitute a "specific, legitimate reason" supported by substantial evidence to justify discrediting Dr. Littlefield's opinion. The ALJ found that "[t]he preponderance of the medical evidence indicates that the claimant has mostly received GAF scores ranging from 51 to 60, indicating moderate symptoms." *Id.* (citing AR at 504–05, 508, 535, 548,

564).  The ALJ dismissed the previous report in which Dr. Littlefield evaluated McDade's GAF to be 50 because it "was during a visit when the claimant was experiencing an increase in his anxiety symptoms."  *Id.* at 32.

The ALJ's reference to a minor inconsistency in the treating physician's opinion is not a sufficient reason to reject it.  *See Sprague v. Bowen*, 812 F.2d 1226, 1230–31 (9th Cir. 1987) (holding mere reference to two inconsistencies in a treating physician's notes—an unsupported diagnosis of arthritis, and the treating physician's evaluation of the claimant's pain which the ALJ found inconsistent with claimant's testimony that she was learning to type—does not constitute "specific, legitimate reasons" for disregarding the treating physician's opinion); *Heine-O'Brien v. Astrue*, 359 F. App'x 699, 700 (9th Cir. 2009) (holding that variance in a treating physician's reports on whether the claimant could walk continuously for fifteen minutes or thirty minutes was insignificant and did not justify rejection of those reports).  The Commissioner argues that the ALJ rejected Dr. Littlefield's questionnaire because "Dr. Littlefield appeared to exaggerate [McDade's] condition" considering the discrepancy in GAF scores.  Opp'n at 4.  However, the ALJ simply stated "[t]he preponderance of the medical evidence indicates that the claimant has mostly received GAF scores ranging from 51 to 60, indicating moderate symptoms."  AR at 32 (citing AR at 504–05, 508, 535, 548, 564).  She did not sufficiently "set forth [her] own interpretations and explain why they, rather than [Dr. Littlefield's], are correct."  *See Reddick*, 157 F.3d at 725 (citation omitted).

The Commissioner argues that the difference between a GAF of 50 and 51 to 60 is significant, as "a GAF score of 50 indicates serious symptoms or impairment while a score of 51–60 reflects moderate symptoms or impairment."  Comm'r's Mot. at 3 (citing Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n 1994)).  However, Dr. Littlefield does not report that McDade's highest GAF score in the past year was 50, he reports the upper range to be a score of 55.  AR at 619.  Considering that any score between 51 and 60 indicates a similar level of symptoms or impairments, Dr. Littlefield's misstatement is not substantial evidence to validate the Commissioner's claim that "Dr. Littlefield appeared to exaggerate Plaintiff's condition."  *See* Comm'r's Mot. at 4.

Further, the ALJ's finding that Dr. Littlefield's report is inconsistent with the record as a whole due to the discrepancy in GAF scores is not supported by substantial evidence. Despite Dr. Littlefield reporting McDade's upper GAF score to be 55, the remainder of his report is consistent with his medical records. Dr. Littlefield consistently reports McDade experienced recurrent severe panic attacks and severe anxiety, which were somewhat ameliorated by medication. AR at 619, 609, 594, 596. Dr. Littlefield's conclusion that McDade experiences marked functional limitations in activities of daily living and maintaining social functioning is supported by the notes in Dr. Littlefield's records that state McDade experiences extreme anxiety in public places making him unable to go to the store alone, and in some cases unable to go with a family member. AR at 593, 594, 621. Dr. Littlefield also documented that McDade experiences sleep disturbance, mood disturbance, social withdrawal or isolation, generalized persistent anxiety, feelings of guilt and worthlessness, and difficulty thinking or concentrating. AR at 609, 620. The ALJ does not explain how these symptoms are inconsistent with Dr. Littlefield's opinions in his August 2015 report.

Further, Dr. Littlefield's evaluation of McDade is consistent with the record as a whole. The record demonstrates that multiple psychiatrists and treating physicians assessed McDade's GAF to be between 50 and 60. AR at 505, 509, 535, 548, 564. Dr. Littlefield's statement that McDade has frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner is collaborated by other areas of the record. AR at 621; *see, e.g.*, AR at 507 (August 27, 2013 treating note documenting that McDade experienced poor concentration), 504 (September 17, 2013 note indicating McDade experienced difficulty with concentration), 516 (November 18, 2013 note stating concentration is difficult at times for McDade), 520 (February 10, 2014 evaluation that McDade's concentration was fair).

Dr. Littlefield also reported that McDade has had repeated (three or more) episodes of deterioration or decompensation in work or work-like settings, which is supported by records documenting McDade's panic attacks at work. AR at 621, 562, 554, 545, 552. Dr. Littlefield's assessment that McDade's anxiety has caused a substantial loss of ability to respond appropriately to supervision, co-workers, and unusual work situations; and deal with changes in a routine work

setting mirrors treatment notes from other providers that indicate McDade experiences extreme stress in workplace settings, and difficulties working with others because of his anxiety. AR at 622, 436, 562, 554, 545, 548, 600–01.

Moreover, the Commissioner has clarified that mention of the GAF scale during the 2000 revision of the mental health listings was not an "endorse[ment of] its use in the Social Security and SSI disability programs, but to indicate why the third sentence of the second paragraph of proposed 12.00D stated that an individual's medical source 'normally can provide valuable additional functional information.'" 65 Fed. Reg. 50746, 50764–50765. The Commissioner has made clear that GAF scores "do[] not have a direct correlation to the severity requirements in [the] mental disorders listings." 65 Fed. Reg. 50746, 50765 (August 21, 2000); *see also McFarland v. Astrue*, 288 F. App'x 357, 359 (9th Cir. 2008) (noting the Commissioner's statement). Considering this, a score between 51 and 60 does not preclude the severity of symptoms Dr. Littlefield and others report in the medical record.

The ALJ's reliance on an error in Dr. Littlefield's report, despite consistency of the remainder of his report with the record, is not substantial evidence of a conflict between Dr. Littlefield's treatment notes and his opinion regarding the severity of McDade's anxiety. *See Ghanim*, 763 F.3d at 1162 (holding that "the ALJ's example of one note, out of over one hundred pages of treatment notes," where the treating physician's record stated the claimant "did not appear to be impaired psychiatrically, is not substantial evidence of a conflict between the treatment notes and the treating providers' opinions regarding the severity of [the claimant's] impairment").

## C.     Remand for Benefits is Appropriate

If an ALJ has improperly failed to credit claimant testimony or medical opinion evidence, a district court must credit that testimony as true, and remand for an award of benefits if three conditions are satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be

required to find the claimant disabled on remand.
*Garrison*, 759 F.3d at 1020. Under such circumstances, a court should not remand for further administrative proceedings to reassess credibility. *See id.* at 1019–21. This "credit-as-true" rule, which is "settled" in the Ninth Circuit, *id.* at 999, is intended to encourage careful analysis by ALJs, avoid duplicative hearings and burden, and reduce delay and uncertainty facing claimants, many of whom "suffer from painful and debilitating conditions, as well as sever economic hardship." *Id.* at 1019 (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398–99 (9th Cir. 1988)).

A court may remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 2021. A court may also remand for the limited purpose of determining when a claimant's disability began if that date is not clear from the credited-as-true opinion. *See House v. Colvin*, 583 F. App'x 628, 629 (9th Cir. July 12, 2014) (citing, *e.g.*, *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010)). Outside of those circumstances, remand for further proceedings is an abuse of discretion if the credit-as-true rule establishes that a claimant is disabled. *Garrison*, 759 F.3d at 1020.

Here, as discussed above, the ALJ failed to credit Dr. Littlefield's opinions regarding McDade's limitations. The ALJ's error was not harmless because the Court cannot conclude that "no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006).

The Commissioner, arguing against the application of the credit-as-true rule here, contends that McDade's "ability to vacation in Florida for a month and have fun was inconsistent with allegations that he was unable to leave his house or maintain minimal social interactions" casts "serious doubt" McDade is disabled. Comm'r's Mot. at 7. It is not at all clear that ever having fun or going on vacation is probative of a person's ability to work consistently. Moreover, the Commissioner's characterization of McDade's time in Florida fails to account for the facts that he sought treatment there multiple times, and his condition worsened. AR at 596.

Further, the Court is also not persuaded that the opinions of the nonexamining consultants

37

warrant further proceedings. Drs. Clay and DeCubas—whom the ALJ credited in determining the RFC—wrote their reports in 2014, and thus did not review the entire body of medical evidence; specifically, the records of McDade's treating physician, Dr. Littlefield, and therapist, Miyazawa from 2015. AR at 94, 106, 596, 606. The Ninth Circuit has held, albeit in an unpublished opinion, that it is an error to give "'great weight' to the non-treating State agency consultant's opinion even though . . . the consultant did not review a substantial portion of the relevant medical evidence, including the records from [the claimant's] treating physicians." *Herron v. Astrue*, 407 F. App'x 139, 141 (9th Cir. 2010) (citing 20 C.F.R. §§ 404.1527(a)–(e), (f)(2)(ii)). The fact that the non-examining consultants here had not reviewed a significant portion of the medical evidence is one of many differences that distinguish this case from *Dominguez v. Colvin*, 808 F.3d 403 (9th Cir. 2015), where the Ninth Circuit noted the adverse determinations of non-examining doctors, as well as other doctors who had examined the claimant, as one relevant factor in affirming a district court's decision to remand for further proceedings rather than for an award of benefits. *Cf.* 808 F.3d at 409.

Here, the Commissioner has not identified any legitimate reason why the record is incomplete or further proceedings would be useful. The ALJ failed to provide legally sufficient reasons to reject Dr. Littlefield's opinions. *See id.* at 1022. If Dr. Littlefield's opinion is credited as true, upon remand the ALJ would be required to find McDade disabled because he satisfies "Paragraph B" criteria under Listing 12.06 for anxiety, which at the time of the ALJ's decision[8] required the claimant suffer at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00. Dr. Littlefield evaluated McDade's functional limitations as a result of his anxiety to be marked in activities of daily living

---

[8] As noted above, no party has argued that the Court should evaluate this case based on intervening amendments to the mental impairment listings. The Court declines to address the issue sua sponte and assumes for the purpose of this order that the listings in effect at the time of the ALJ's decision continue to govern McDade's application. Citations herein to such listings refer to those versions.

and maintaining social functioning; as well as repeated episodes of decompensation. AR at 621. Dr. Littlefield's report also demonstrates that McDade satisfies "Paragraph C" criteria for 12.04 as he has repeated episodes of decompensation, and 12.06 as he is unable to function independently outside the area of his home due to his anxiety. AR at 621.

Even if McDade did not satisfy "Paragraph B" or "Paragraph C" criteria, Dr. Littlefield determined McDade's anxiety makes him unable to "respond appropriately" to supervisors and coworkers. AR at 622. Otherwise accepting the ALJ's residual functional capacity assessment—which limited McDade to "perform[ing] simple, repetitive tasks, . . . occasionally work[ing] with the general public, and . . . avoid[ing] concentrated exposure to pulmonary irritants," *id.* at 27—the VE testified that there would be no jobs for such a person if they were unable to work as part of team or one-on-one with supervisors. *Id.* at 82–83. The ALJ did not identify and the Court is not aware of any contrary medical or vocational opinion regarding McDade's ability to work with supervisors appropriately or whether such inability would preclude employment. The Court therefore has no "serious doubt as to whether the claimant is, in fact, disabled," and concludes an award of benefits is appropriate. *See Garrison*, 759 F.3d at 1019–21.[9]

Because the ALJ's failure to credit Dr. Littlefield's testimony is sufficient reason to remand for an award benefits, the Court does not reach the parties' arguments regarding the ALJ's treatment of Miyazawa's opinions.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[9] Under the statutory framework for disability benefits, not all impairments that prevent a claimant from working necessarily meet the definition of "disability." The law requires that an impairment "has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Dr. Littlefield's opinion found McDade's impairment had lasted and would continue to last at least twelve months. AR at 622. Crediting those opinions pursuant to Ninth Circuit doctrine, and in the absence of evidence to the contrary, that requirement is satisfied here.

## IV.     CONCLUSION

For the reasons discussed above, McDade's motion for summary judgment is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED with instructions to award benefits consistent with this order.

**IT IS SO ORDERED.**

Dated: September 27, 2018

_____
JOSEPH C. SPERO
Chief Magistrate Judge